**Affirm and Opinion Filed January 15, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-20-00699-CV**

**IN THE INTEREST OF C.B. AND V.H., Children**

**On Appeal from the 305th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. JC-18-00992-X**

## MEMORANDUM OPINION

Before Justices Myers, Molberg, and Carlyle
Opinion by Justice Molberg

In this suit affecting parent-child relationships, Mother appeals the termination of her parental rights to two of her children, C.B. and V.H. Specifically, Mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination was in the children's best interest.[1] We affirm in this memorandum opinion. *See* TEX. R. APP. P. 47.4.

---

[1] Mother does not challenge the court's findings that Mother engaged in conduct under sections 161.001(b)(1)(D) and (E), the only two predicate grounds cited in the court's judgment. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E).

## BACKGROUND

In July 2018, the Texas Department of Family and Protective Services received a report regarding Mother, her boyfriend (S.M.) and three children. Two of those three children were C.B. and V.H., the only children affected by the judgment at issue in this appeal.[2] According to the Department investigator, the Department's intake for the family concerned the children being bounced around from house to house, a concern they were going to be homeless that evening, and an allegation that Mother and S.M. possessed marijuana and were selling drugs.

Following that referral, the investigator met with Mother and the children,[3] asked to see the home where they were staying, and asked that drug tests be done on Mother and S.M. The hair strand drug tests administered revealed a positive result for methamphetamines, amphetamines, and cocaine for both Mother and S.M. The investigator testified that Mother and S.M. admitted to marijuana use but indicated that they were living in a location where they believed methamphetamines were being used and that the drug had been put in their food in that location. The Department tried to find placement of the children with family members or friends in order to do a parent-child safety plan, but was unsuccessful after numerous

---

[2] Mother's rights to K.B., the third child in that report, are not at issue in this appeal.

[3] In this portion of the investigator's testimony, it is not clear whether she met with all three children. Throughout this opinion, other than in this specific reference to "the children," our references to "the children" refers to C.B. and V.H., while "the three children" refers to C.B., V.H., and K.B.

attempts.  The Department filed for removal, and the three children were placed in a foster home.

On August 16, 2018, the Department filed its petition to terminate Mother's parental rights to the three children.  The following day, the trial court entered an ex parte order for emergency care and temporary custody of the three children until a hearing could be held.

On September 12, 2018, following a hearing, the trial court entered a temporary order appointing  the Department as the temporary managing conservator of the three children, appointing Mother as their temporary possessory conservator, and entitling Mother to supervised visitation with them.

Later, the Department non-suited its petition regarding K.B., and a binding mediated settlement agreement (MSA) was reached regarding C.B. and V.H., signed by Mother, S.M., and others on June 20, 2019.  Mother and S.M. agreed to a safety plan, and the children were returned to Mother for a statutory monitored return.[4]

Based on subsequent events, however, the Department removed the children a second time in early December 2019 and returned them to their prior foster home, after Mother declined an alternative that would have kept her and the children living together.[5]

---

[4] *See* TEX. FAM. CODE § 263.403(a).

[5] According to the caseworker's trial testimony, during a family group conference in December 2019, the Department discussed an option with Mother that would have allowed her and the children to live with Mother's cousin, who agreed to house them but who would not allow S.M. on her property.  Mother declined, making it clear that she would remain in a relationship with S.M. and would get an apartment.

The trial court granted a second ex parte order for emergency care and temporary custody until a hearing could be held. Following a hearing the next month, the trial court entered another temporary order appointing the Department as the children's temporary managing conservator, appointing Mother as their temporary possessory conservator, and entitling Mother to supervised visitation with the children.

Trial before the court began on June 2, 2020, and concluded on July 14, 2020.[6] Seven witnesses testified, including Mother, the children's foster mother, the children's therapist, a CASA volunteer, and three Department representatives involved in the case, including an investigator, a caseworker, and a supervisor.

During its case-in-chief, the Department called each of those witnesses except Mother. After the Department rested, Mother recalled the therapist and the Department supervisor. Mother testified last.

During Mother's testimony, she discussed, among other things, various details regarding her job, her prior and current living situations, and her relationship with S.M. and some of their time living together with the children. Mother testified that she had worked in the same job for the same company throughout the case and serves as a call center agent for the United States Mint. She works five days a week and has worked from home since the COVID-19 pandemic began. Since March 2020,

---

[6] According to the reporter's record, the bench trial began on June 2, 2020, continued on June 23, 2020, and concluded on July 14, 2020. The trial court pronounced its ruling on July 20, 2020, and entered its judgment on August 10, 2020.

–4–

Mother has lived in a one-bedroom, one-bathroom trailer. Mother testified she was "stable," was "not moving around from place to place," and had a "stable home for [the children] to stay, to live in," with "a functioning kitchen, bathroom, everything that my children need." Mother acknowledged making mistakes but stated, "I have changed."

Mother also testified she and S.M. began a relationship in 2017 and ended it in April 2020. She stated that between July and December 2019, she had "an issue with moving around" and, when asked, "[H]ow many different motels did you drag your children through?" she answered, "Three."

The Department's six witnesses testified about various events and matters they witnessed in the time leading up to or in December 2019, including multiple changes in the children's living situation and the conditions in which they lived. The caseworker testified that when the children were returned to Mother for the monitored return, they lived in an apartment with Mother's sister, S.M., and S.M.'s children. A total of nine individuals—three adults, six children—lived in that two-bedroom, one-bathroom apartment.

S.M. was unemployed at that time, and Mother was the only one paying the bills. CASA provided Mother with two beds, coats, jeans, clothing, and other necessities to help her provide for the children. Mother could not afford the rent, and despite the Department's communications with the landlord to set up a payment plan, rent was not paid, and the family was evicted in September 2019. The family

moved from the apartment into a motel, and Mother either sold or discarded the beds CASA provided for the children.[7]

In October 2019, before the caseworker could visit with the family after their eviction from the apartment, the family was evicted from the first motel and moved into a second motel. On October 9, 2019, the caseworker made an unannounced visit to the school that Mother had told her the children were enrolled in, and she learned that the children were not enrolled. Mother was required to enroll the children in school within forty-eight hours of moving but did not do so within that time frame upon moving to the second motel.

On October 30, 2019, the CASA volunteer went to the second motel to pick up the children after school and take them shopping for Halloween costumes and for a quick dinner. The volunteer had previously arranged the visit with Mother. The children were not there when the volunteer arrived. Mother called S.M., who was at the motel room, to find out where the children were. The CASA volunteer was in the parking lot, and S.M. came out of the motel room and told the CASA volunteer the children should have walked there from school and should have already been there. The CASA volunteer drove toward the school and described the weather as "very cold" and "pouring down rain" at the time. Ultimately, she found C.B., V.H., and two other children (both S.M.'s) under a concrete overpass near a busy street.

---

[7] Mother testified CASA provided mattresses, while the CASA volunteer testified they were beds.

The children were cold, wet, and without coats.[8] The CASA volunteer drove the four children to the motel and talked with Mother about the events. The CASA volunteer testified that Mother told her that she thought S.M. was supposed to have picked up the children, but Mother did not appear upset and seemed "nonchalant" about the situation.

In November 2019, the family moved to a third motel room. The caseworker visited that month and saw Mother, who was lying on the bed, five or six children, including C.B. and V.H., two dogs, two beds without any sheets, leftover food on various surfaces, soiled sheets on the floor with other clothes, towels, and blankets, and the smell of dog urine and feces in the room. The caseworker described C.B. and V.H. as clad in dirty clothes with unkempt hair. The caseworker went over her concerns and the safety plan with Mother and informed Mother the dogs needed to be removed by November 15.[9] The dogs were not removed.

When the caseworker arrived on November 19, 2019, police and animal control personnel were present. They were there as a result of separate events, one

[8] The CASA volunteer testified that CASA had already provided the children with coats. Based on the the testimony of the CASA volunteer and Mother, there is some evidence that dogs urinated on the coats and destroyed them. Mother testified the children had three coats each but said, "Yes" when asked, "[I]s it true that the dogs did destroy the jackets or some jackets that were provided by either the school or by CASA?"

[9] The caseworker testified at one point during trial that the dogs were not being treated humanely and that one of the dogs appeared to be very aggressive and unhappy in the cage he was in. She also testified the Department was very concerned regarding the children's well-being with that dog because the dog could have bitten or lashed out at them. As we discuss elsewhere, it is undisputed that this dog bit Mother on November 19, 2019.

involving dog bites and one involving investigation of a physical altercation between Mother and S.M. The children were present for both.

As to the dog bites, Mother had been bitten by one of the dogs—a pit bull—with bites to her arm in three places. Her wounds required thirteen stitches. S.M. arrived while the caseworker was there. The caseworker heard S.M. become aggressive and verbally abusive toward Mother and described S.M. as becoming "enraged" that Mother had attempted to take the dog out for a walk. The caseworker testified S.M. called Mother "stupid," kept yelling about how he could get his dog back, and told Mother he had told her over and over not to touch the $1,000 dog. S.M. did not seem concerned about Mother or the children, and Mother's shirt was covered in blood.

Mother did not dispute that she was bitten by the pit bull or that she required thirteen stitches. She also did not dispute that the children were around the dog, though she said the dog was caged. She agreed that after she was bitten, S.M. seemed more concerned about the dog than her, and she agreed this was not a safe environment for the children to be exposed to.

As previously indicated, police were also on the scene on November 19, 2019, to investigate a physical altercation between Mother and S.M. in which Mother threw a glass cologne bottle at S.M.[10] The children were present during the

---

[10] Mother stated this physical altercation began with an argument about her need for S.M. to be around more to help her provide for the family. Mother agreed that she threw a glass cologne bottle at S.M. and that this was not a healthy environment. She then stated, "That's why we're not together now."

altercation. At time of trial, Mother had a pending family violence charge regarding this event.

In addition to describing the November 19, 2019 events involving the dog bites and the police presence, the caseworker also described the condition of the family's motel room that day as being in a state of disarray, with clothes on the ground and open food containers on various surfaces.

Within a week after the November 19, 2019 events, the family moved to yet another motel room. The children were not enrolled into school after this, which violated the safety plan.

Meanwhile, because of the short time between the dog bites and yet another move for the family, the Department continued to be concerned that the children were living in an unstable environment that posed a danger to their health, education, and well-being. As a result, the Department decided to remove the children.

On December 3, 2019, the caseworker, CPS staff, and others arrived at the family's new motel room to remove the children. The caseworker described the room as having only one bed for five children and two adults and stated it was generally unsanitary, with clothes everywhere, bedding ripped off the bed, and open old food containers. The caseworker also described the children as appearing generally unkempt and in short-sleeved shirts.

During trial, the caseworker explained the basis for her testimony that mother engaged conduct under section 161.001(b)(1)(D) and (E), stating that Mother did not

comply with multiple safety plans that indicated she could not drive the children without a driver's license, moved the children frequently where there was no stable housing or education for them, and the housing she had was observed multiple times to be unsanitary, which affects the children's health.

As to the children's best interest, the Department caseworker, the therapist, and the CASA volunteer all testified they believed that termination of Mother's parental rights was in the children's best interest. The caseworker explained that her belief was based on the fact that Mother continued to show a consistent lack of stability in housing, in her relationship with S.M.,[11] and her interaction with the children, and on the fact that the children had a foster home that provided them with stability and could adopt them.[12] Like the caseworker, the therapist and the CASA volunteer agreed that termination of Mother's parental rights was in the children's best interest. The therapist agreed that she held this belief even though the children still wanted to maintain contact with Mother.

---

[11] Despite Mother's other testimony, even at trial, Mother testified she believed S.M. was a good parental figure for the children. Also, when Mother testified that S.M. seemed more concerned about the dog than about her November 19, 2019, when law enforcement arrived and she was being treated for dog bites, the following exchange occurred:

> [Department attorney]: Q. And yet, that was back in November and you claim that you continued to stay in a relationship, according to you, until just April of 2020; is that right?
>
> [Mother]: A. Yes, I did.
>
> [Department attorney]: Q. So despite all of those motel moves with your children and despite a domestic violence case and despite a serious dog bite and his decision making, you elected to stay in a relationship with him until April of this year, according to you; is that right?
>
> [Mother]: A. Yes, I did.

[12] She also testified the foster parents were interested in adopting C.B. and V.H.

The therapist and the foster mother also testified regarding various experiences and observations regarding the children, both before and after the Department's second removal of the children from Mother's care. The therapist, for example, testified that she believed that returning the children to Mother would endanger their physical or emotional well-being. When asked to explain why, the therapist answered that Mother provided the children "no structure or parental guidance or boundaries," and stated, "On several occasions that I have gone, [the children] always talked about being hungry." She then testified about other matters regarding nutrition and stated, "So in making sure the kids are well nourished, taken care of and nurtured, I don't see that as a practice that will be simplified with [Mother]." When asked whether the children were still having the same issue in their foster home (their placement at the time of trial), the therapist stated, "No, sir."

The therapist also made certain observations regarding the children's behavior while under Mother's care. She reported that C.B. did not want to do what Mother asked of her regarding cleaning up because C.B. believed Mother was not responsible. She also reported the children were "constantly getting into it with one another" and that they had no parental guidance teaching them how to respect one another. The therapist described Mother as "hands-off" and stated the children "really didn't take anything serious that she said" and "just did whatever they wanted to do" when with her. When asked whether she saw any improvement from July 2019 until the day the children were removed again in December 2019, she stated,

–11–

"They kind of reverted back to what they more or less . . . used to do, not having parental supervision or any expectations or any guidance as to how they should behave or not behave."[13]

The foster mother provided a similar observation regarding the regression in the children's behavior that she observed when the children were returned to her in December 2019 after being placed in Mother's care a few months earlier. Foster mother noted that when they returned, both children struggled with cleanliness and hygiene and hoarded food in their room by hiding it under the bed. The foster mother also testified C.B. initially appeared depressed and V.H. had more explosive anger issues, and that these issues continued for about another month and one-half for V.H. and two months for C.B. after the children returned. With additional therapy, however, the children improved.

The foster mother also explained that C.B. did not want to visit with Mother during virtual visitation, refused to talk to Mother on the phone on Mother's Day, and did not want to talk to Mother because she believed S.M. was present.[14]

After both sides rested and closed, the trial court asked for the recommendation of the children's guardian ad litem, who responded, "I believe the termination is in the best interest of the children."

---

[13] As to her reference to what the children "used to do," the record reflects that the therapist began working with the children in September 2018.

[14] When Mother was asked about foster mother's testimony regarding C.B.'s reluctance to talk to Mother because she believed S.M. was there, Mother denied that S.M. was present but refused to identify who was, except to say it was "a friend."

The court pronounced its ruling in open court on July 20, 2020.  On August 10, 2020, the court issued a "Final Decree Order of Termination on Judgment on Verdict of Court," the judgment at issue in this appeal.  The court found by clear and convincing evidence that termination of Mother's parental rights to C.B. and V.H. was in the children's best interest and that Mother committed the conduct defined by sections 161.001(b)(1)(D) and (E).[15]  The court's judgment states, in part:

> The [c]ourt finds that [Mother] knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to 161.001(b)(1)(D), Texas Family Code [and] engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children pursuant to 161.001(b)(1)(E), Texas Family Code.

During its July 20, 2020 pronouncement, the court stated the following, in part:

> Based on the testimony before the Court, the Court does find by clear and convincing evidence that the mother has committed the conduct as defined by Section 161.001(b)(1)(D) of the Family Code and (E).
>
> Regarding the grounds, the mother failed to comply with multiple safety plans, continued apparently to drive without a license and just moved these children around in a way that was tremendously unstable. The environment they have been in regarding the (D) and (E) grounds has been unstable, unsanitary.
>
> The children [were] not in school and [were] apparently around this aggressive dog that it bit the mother in a way that it required some serious medical care.  So the (D) and (E) grounds are clear.
>
> . . . .
>
> Regarding the best interest issue.  I do find regarding mother that it would be in the children's best interest that her rights be terminated. Just to review . . . I know the mother just says, give me one more

[15] *See* TEX. FAM. CODE §§ 161.001(b)(1)(D), (E).

chance. These children can't afford another chance. They apparently really regressed after being placed with the mother this last time.

Mother has just a demonstration of not being able to be stable, to provide these children with the type of structure that they need, there don't appear to be boundaries for the children. There is a violation of the safety plan. The mother failed to meet the children's educational needs. And consistently made poor decisions regarding these children. It looks like she continued to choose [S.M.] over the children.

And at this point, she really hasn't demonstrated a long term plan that would indicate she would be able to be stable. The environment has just been chaotic over the time if there was a return to her.

Mother filed a notice of appeal on July 20, 2020, the same day the trial court pronounced its ruling but before the trial court signed its August 10, 2020 judgment. Once we confirmed our jurisdiction over the appeal,[16] Mother and the Department submitted their briefs, and the case was submitted for our decision.

## DISCUSSION

### A.    Burden of Proof and Standard of Review

The involuntary termination of parental rights involves fundamental constitutional rights. *In re G.M.*, 596 S.W.2d 846 (Tex. 1980). A natural parent's desire for—and right to—the companionship, care, custody, and management of his or her child is an interest "far more precious than any property right." *Santosky v.*

---

[16] On August 7, 2020, after we received the clerk's record, we issued a letter to the district clerk directing her to file a supplemental clerk's record with a copy of the final decree of termination or, if it did not exist or could not be located, to so state in writing. The district clerk responded and stated that no final order had been signed, which led us to issue a directive to Mother on August 11, 2020, to file a letter brief addressing our jurisdiction over this appeal. On August 14, 2020, the district clerk filed a supplemental clerk's record containing the trial court's August 10, 2020 order. On August 17, 2020, because it was by then apparent that we have jurisdiction, we issued an order vacating our August 11, 2020 directive to Mother. Neither party contests our jurisdiction over this appeal.

–14–

*Kramer*, 455 U.S. 745, 758–59 (1982). A termination order is final and irrevocable, divesting for all time that natural right as well as all legal rights, privileges, duties, and powers between the parent and child except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *see In re M.S.*, 115 S.W.3d 534, 549 (Tex. 2003) (referring to termination of a parent's right to his or her child as "traumatic, permanent, and irrevocable.")

Both the Texas Family Code and federal due process require that grounds for termination of parental rights be proved by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001; *Santosky*, 455 U.S. at 753–54. A trial court may terminate a parent's rights to a child only by clear and convincing evidence that termination is in the best interest of the child and that one or more of the statutory predicate grounds for termination have been met. *In re Z.N.*, 602 S.W.3d 541, 543 (Tex. 2020) (per curiam); TEX. FAM. CODE § 161.001(b).

"'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007. This heightened standard of review requires us to strictly construe involuntary termination statutes in favor of the parent. *In re Z.N.*, 602 S.W.3d at 545 (citations omitted); *Holick*, 685 S.W.2d at 20.

This heightened standard of proof gives rise to a heightened standard of appellate review. *In re Z.N.*, 602 S.W.3d at 545 (citing *In re N.G.*, 577 S.W.3d 230,

235 (Tex. 2019)). For both legal and factual sufficiency challenges, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could form a firm belief or conviction that the grounds for termination were proven. *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). Factfinders may draw inferences regarding the evidence, as long as they are "reasonable and logical." *In re Z.N.*, 602 S.W.3d at 545 (citing *In re E.N.C.*, 384 S.W.3d 796, 804 (Tex. 2012)).

The distinction between legal sufficiency review and factual sufficiency review "lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In reviewing legal sufficiency of a finding to support termination, we "'look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true.'" *In re Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d at 266). We assume the trial court resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266). After this review, if we determine that "'no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true,'" then we "'must conclude that the evidence is legally insufficient'" for the trial court's finding. *Id.* (quoting *In re J.F.C.*, 96 S.W.3d at 266).

In reviewing the factual sufficiency of evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegation against the parent. *In re A.B.*, 437 S.W.3d 498, 502–03 (Tex. 2014) (citing *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). "'If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, the evidence is factually insufficient.'" *Id*. at 503 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

Finally, we include two other important points affecting our review. First, while we fully appreciate the "constitutional magnitude" afforded parental rights, we also recognize the imperative that we not sacrifice the "emotional and physical interests of the child . . . merely to preserve that right." *In re C.H.*, 89 S.W.3d at 26.

Second, in *A.B.*, the supreme court observed, "While parental rights are of a constitutional magnitude, they are not absolute," and, despite the heightened review standards, courts of appeals "must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *Id*. (citing *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

*B.      Best Interest Considerations and Mother's Sole Issue on Appeal*

In addition to making the statutory predicate findings for termination under sections 161.001(b)(1)(D) and (E), the trial court concluded that termination of Mother's parental rights was in C.B.'s and V.H's best interest.  *See* TEX. FAM. CODE § 161.001(b)(2).  In her sole issue on appeal, Mother argues the evidence was legally and factually insufficient to support this finding.[17]

"Best interest" is a term of art encompassing a broad "facts-and-circumstances based evaluation that is accorded significant discretion." *In re Lee*, 411 S.W.3d 445, 460 & n.22 (Tex. 2013).   The best interest prong "is child-centered and focuses on the child's well-being, safety, and development," *In re A.C.*, 560 S.W.3d at 631, and it allows a court to consider the following non-exclusive factors:

(1) the desires of the child;

(2) the emotional and physical needs of the child now and in the future;

(3) the emotional and physical danger to the child now and in the future;

(4) the parental abilities of the individuals seeking custody;

(5) the programs available to assist these individuals to promote the best interest of the child;

---

[17] In her "Issue Presented," Mother states, "Is the evidence legally and factually sufficient to support the trial court's finding pursuant to Texas Family Code Section 161.001(2) and 161.003(a)(5) that termination of [Mother's] parental rights is in the best interest of the children?"  For purposes of this appeal, we assume that the first statutory reference is merely a typographical error and refers to section 161.001(b)(2).  *See* TEX. FAM. CODE § 161.001(b)(2).  We also assume that the second statutory reference was inadvertent, as the trial court in this case made no findings regarding section 161.003(a)(5).  As a result, and because neither party discusses section 161.003(a)(5) in their substantive arguments, we do not discuss that section in our opinion.  *See id*. § 161.003(a)(5).

(6) the plans for the child by these individuals or by the agency seeking custody;

(7) the stability of the home or proposed placement;

(8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9) any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see In re A.C.*, 560 S.W.3d at 631 & n.29 (citing *Holley*, while listing many of these same factors and noting that family code section 263.307 also provides additional best-interest factors).[18]

These *Holley* factors are not exhaustive, and a best-interest finding need not be supported by evidence of every *Holley* factor. *In re C.H.*, 89 S.W.3d at 27. The same evidence can be relevant to both section 161.001(b)(1) termination grounds and the child's best interest. *Id.* Moreover, while there is a strong presumption that maintaining the parent–child relationship serves the child's best interest, there is also a presumption that promptly and permanently placing the child in a safe environment

---

[18] Section 263.307(b) lists several best-interest factors that the trial court and the Department can consider in determining whether a child's parents are willing and able to provide the child with a safe environment, including (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department or other agency; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, or other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b). We do not discuss these in detail here because Mother focuses solely on the *Holley* factors in her appeal.

is in the child's best interest. TEX. FAM. CODE §§ 153.131(b); 263.307(a); *In re D.W.*, 445 S.W.3d 913, 925 (Tex. App.—Dallas 2014, pet. denied).

In *C.H.*, the supreme court stated, "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, partcularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d at 27. Although "paltry evidence relevant to each [*Holley* factor] would not suffice to uphold [a factfinder's] finding that termination is required," *id.*, the evidence here is sufficient, as we conclude below.

## C. *Application*

Generally, Mother contends the evidence was legally and factually insufficient because, according to her, the Department failed to prove by clear and convincing evidence that termination of Mother's parental rights was in the children's best interest based on the *Holley* factors. We disagree.

In her brief, Mother addresses only five of the nine *Holley* factors,[19] and her discussion of those factors consists primarily of conclusions rather than citations to the evidence or citations to any cases that support her conclusions. Even when

---

[19] Although Mother cites all nine *Holley* factors in her brief in the discussion regarding the standard of review, when analyzing those factors and discussing the evidence here, Mother only addresses the first, second, third, fourth, and seventh *Holley* factors, while ignoring the fifth, sixth, eighth, and ninth. In contrast, the Department's response discusses all nine factors.

Mother included specific references to the evidence,[20] she failed to address the majority of the other evidence at trial. Much of the evidence in this case was not disputed, and to the extent that it was, the differences were not so significant as to keep a reasonable factfinder from forming a firm belief or conviction that termination of Mother's parental rights was in the children's best interest.

As to the first *Holley* factor, Mother maintains this factor weighs in her favor, though as the Department discusses in its brief, the evidence regarding the children's desires is not as clear-cut as Mother suggests. However, even if we assume this first *Holley* factor weighed in her favor, we agree with the Department's view that, based on the entire record, the other eight *Holley* factors support the trial court's finding.

In light of the entire record in this case, we conclude that the evidence, as outlined above, was legally and factually sufficient to support the trial court's finding because, under either a legal sufficiency or a factual sufficiency review, the evidence would allow a reasonable factfinder to form a firm belief or conviction that termination of Mother's parental rights was in C.B.'s and V.H.'s best interest.

---

[20] On the first factor, Mother noted that the therapist testified that the children still wanted to see or spend time with her. On the second factor, Mother noted the details regarding her job, her plans to allow her to her continue the children's therapy, her completion of court-ordered services, her visits to the children throughout the case, her statement that she made mistakes in the beginning but had changed, and her living situation since March 2020, which showed she was stable and that she was not moving from place to place. On the third factor, Mother cites her job and states "she could provide a good home for C.B. and V.H." On the fourth factor, Mother cites her completion of parenting classes and court-ordered services. On the seventh factor, Mother cites her job and her living situation since March 2020.

## CONCLUSION

We overrule Mother's sole issue and affirm the trial court's judgment.

/Ken Molberg/

KEN MOLBERG

200699f.p05

JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

IN THE INTEREST OF C.B. AND V.H., CHILDREN., Appellant

No. 05-20-00699-CV

On Appeal from the 305th Judicial District Court, Dallas County, Texas Trial Court Cause No. JC-18-00992-X.
Opinion delivered by Justice Molberg. Justices Myers and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 15th day of January, 2021.